IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steven Ashby,                          :
               Appellant              :
                             :
         v.                        :
                             :
Southeastern Pennsylvania              :    No. 1703 C.D. 2016
Transportation Authority               :    Argued: March 8, 2018


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON        FILED: April 5, 2018


        Appellant Steven Ashby (Appellant) appeals from the September 30, 2016 order of the Philadelphia County Court of Common Pleas (trial court) granting the Southeastern Pennsylvania Transportation Authority's (SEPTA) motion for a new trial. Because the trial court[1] acted within its discretion in granting SEPTA's motion for a new trial, we affirm.

## I. Facts and Background

        On the night of July 11, 2012, Appellant was working for SEPTA as an assistant conductor,[2] a ticket-collecting training position wherein SEPTA employees

---

[1] The Honorable Mark Bernstein of the Court of Common Pleas of Philadelphia County presided over this matter at trial and retired after granting SEPTA's motion for a new trial. The Honorable Angelo Foglietta drafted the trial court's Pa. R.A.P. 1925(a) opinion.

[2] Appellant began working as an assistant conductor on July 11, 2011.

learn about railroad operations prior to beginning training as a locomotive engineer. On that night, Appellant stood in the vestibule of a SEPTA Silverliner IV car holding on to a metallic grab iron[3] attached to the vestibule wall as the car approached Center City, Philadelphia, from the Philadelphia International Airport. At an interlocking[4] where SEPTA's tracks joined those of Amtrak and an overhead catenary system,[5] Appellant observed an abnormally bright and long-lasting blue spark illuminate the sky above where he was standing. At the same time, Appellant claimed to have felt a jolt of electricity surge into his hand holding the grab iron. Appellant claimed to have suffered injuries as a result of this alleged shock. Following the incident, SEPTA took the railcar out of service and inspected it. After the inspection detected no defects in the railcar, SEPTA returned the car to service.

Appellant presented the expert testimony of George Widas[6] at trial. Prior to the trial, Widas drafted a preliminary expert report for Appellant. *See* Widas Preliminary Report, October 16, 2014 (Expert Report). In the Expert Report, Widas attributed Appellant's injury to a phenomenon called "spillover electricity" that caused electrical arcing between the pantograph[7] above Appellant's head and the

---

[3] A "grab iron" is a hand hold.

[4] An "interlocking" is a collection of track and signaling appliances designed to prevent train collisions at junctions and/or crossings by disallowing "safe-to-proceed" signals to appear unless and until the route to be used has been proven safe.

[5] An "overhead catenary system" is the overhead wire system used to transmit electrical current to some trains.

[6] Widas graduated from Syracuse University in 1972 with a Bachelor of Science degree in Civil Engineering. Widas Curriculum Vitae, p. 1. He is a registered engineer in New York, New Jersey, Pennsylvania, South Carolina, and Delaware, and is certified by the Board of Safety Professionals as a Certified Safety Professional. *Id.*

[7] A "pantograph" is the electrical apparatus or coupling that extends from the top of a railway car or bus to the overhead catenary system, thus supplying electricity to the vehicle.

uninsulated grab iron he was holding onto at the time of the incident, resulting in Appellant's electrocution and injury. Expert Report at 22-23 & 25. Widas concluded that the hazardous and unsafe condition that resulted in Appellant's injury could have been mitigated or eliminated by proper inspection and maintenance by SEPTA, including wrapping the grab irons with an insulating material. *Id.* at 26.

On May 5, 2015, SEPTA filed Defendant's Motion In Limine to Preclude Certain Opinions Offered By Plaintiff's Liability Expert, George Widas, PE (Motion In Limine). The Motion In Limine argued that, because the regulations promulgated by the Federal Railroad Administration (FRA) govern the railroad industry, the trial court should preclude multiple opinions expressed in the Expert Report under the doctrine of federal preemption. *See* Motion In Limine at 3-7. Specifically, the Motion In Limine argued that the trial court should preclude Widas from offering any opinions at trial: 1) "that SEPTA violated a standard of care if that standard of care has not been established by the FRA"; and 2) "[s]ince [Occupational Safety and Health Administration (OSHA)] regulations have no applicability to the incident at issue, . . . Widas should be precluded from referring to OSHA or any other standards which are not expressly issued or approved by the FRA." Motion In Limine at 6, ¶ 14; 7, ¶ 17. The trial court denied the Motion In Limine without prejudice for SEPTA to renew the motion at trial should inappropriate testimony require renewal of the motion. Trial Court Order, June 6, 2016.

At trial, the trial court permitted extensive voir dire of Widas' expert qualifications. *See* Notes of Testimony (N.T.) 6/21/2016 (morning session) at 82-107. During voir dire, Widas acknowledged that the FRA regulates all aspects of the railroad industry and promulgates and publishes the controlling regulations to that end, but conceded he had not reviewed the FRA regulations. *Id.* at 100-05.

3

Widas opined, however, that the federal regulations had no relevance to his opinion because "[t]his [case] is a safety analysis of a failure of an electrical system that was, in my opinion, designed and manufactured properly but malfunctioned at the time of the event because of maintenance issues." *Id.* at 106. Following voir dire, SEPTA renewed its Motion In Limine outside the presence of the jury. *Id.* at 107-15. Following argument, the trial court denied SEPTA's motion, qualified Widas as an expert,[8] and allowed him to testify without restrictions. *Id.* at 114.

On direct examination, Widas did not testify that Appellant's injuries resulted from a failure to insulate grab irons, as the Expert Report stated. Instead, Widas accused SEPTA of negligence based on a failure to ensure proper spacing of rubber baffles between the train cars, which baffles were never mentioned in the Expert Report.[9] *See* N.T. 6/20/2016 (Volume 2) at 3-32. As nothing about the baffles appeared in the Expert Report, the trial court precluded this testimony. Additionally, Widas confirmed the conclusion from the Expert Report that the phenomenon of "spillover electricity" caused Appellant's injuries. *Id.* at 26-32.

SEPTA subjected Widas to extensive cross-examination, including questioning regarding the concept of "spillover electricity." *See* N.T. 6/20/2016 (Volume 2) at 32-105. Widas admitted he had not read the pertinent federal rules and regulations related to railroads and rail car inspections/maintenance or the rail car manufacturer's specifications and manuals. *Id.* at 40-49. He also conceded that

---

[8] The trial court qualified Widas as an expert "in the field[s] of professional engineering and safety engineering, especially in the field[s] of workplace safety, electrical science, and electrical safety." N.T. 6/21/2016 (morning session) at 91.

[9] SEPTA objected to the various pieces of testimony not grounded in the pre-trial Expert Report, the majority of which objections the trial court overruled. *See* N.T. 6/20/2016 (Volume 2) at 3-32.

4

electrical arcing between the pantograph and the catenary is normal. *Id.* at 55-59. As to "spillover electricity," Widas admitted the term[10] does not appear in any scientific or industry literature and that Widas had created the term himself. *Id.* at 98-100.

Following this testimony, SEPTA moved to strike Widas' testimony in its entirety. The trial court granted the motion to strike[11] and instructed the jury to disregard all of Widas' testimony.[12]

---

[10] The 1925(a) opinion describes "spillover electricity" as "the mechanism by which [Widas] opined that [Appellant] was exposed to electricity, electricity that went through the body of [Appellant] and then into the grab iron which was a grounded object[.]" Trial Court Pa. R.A.P. 1925(a) Opinion, dated January 17, 2017, at 3.

[11] The trial court explained its grant of the motion to strike as follows:

> The motion to strike expert George Widas' testimony is granted. The testimony was not sufficiently based on facts in evidence. He failed to give any specific cause for the arcing or any specific failure by SEPTA.
>
> He failed to properly deal with Federal regulations, failed to explain the supposedly scientific phenomenon he was explaining even though electricity has been studied and talked about since, I think, the 1880s or 1890s.
>
> He was – he thought it was productive to invent a new term not in any of the authoritative works, like – by which I mean spillover electricity.
>
> He failed to say what would have been found if the insulators had been cleaned earlier or how that would have avoided this incident.
>
> Motion to strike is granted.

N.T. 6/22/2016 (morning session) at 13-14.

[12] The trial court instructed the jury as follows:

> Good morning, ladies and gentlemen.

5

While we had you locked up in that little room, I was – I and the attorneys were dealing with various motions concerning Mr. Widas' testimony.

As a result, I have stricken all that testimony.

What does that mean? That means I am directing you not to consider his testimony. You don't have to worry about why I made that ruling, but that is the ruling.

There are a couple things that I have to decide having told you that.

The one thing I have to determine, really, rather than decide, is whether you can follow that instruction, because we heard his testimony for roughly half a day or a little less than that and I have to say to myself: Well, was there anything he said that the jury can't disregard? My conclusion is: No, there is nothing so out of the ordinary that you can't disregard his testimony and can't disregard his opinions.

I am telling you, you have to disregard his testimony and disregard his opinions, but there is a second question that I have to decide. That question is: Will you disregard his testimony and disregard the opinions that he expressed, because I told you when we first began, the case has to be decided on the evidence presented in [c]ourt.

Now, I left out the word, but it's there implicitly: The proper evidence given to you.

If I say to myself: Well, I'm telling them to disregard it and I think they can, they could disregard it, but, you know what? I'm just not sure that they will disregard it.

If that's my conclusion, then I got to say thank you very much and bring in twelve new jurors to decide the case because the case has to be decided only on proper evidence.

Well, I thought about that. I have watched you for two days. I'm confident that not only can you disregard it, but you will disregard it. That means you have to act as if his testimony didn't even exist. You may not consider it, you may certainly not discuss

6

At the close of Appellant's case, SEPTA made a motion for compulsory non-suit. *See* N.T. 6/24/2016 (Volume 5) at 28-30. The trial court denied the motion as to both the Federal Employer's Liability Act (FELA)[13] claim and the Locomotive Inspection Act (LIA)[14] claim.[15] *Id.* at 29-30. SEPTA also motioned for a directed verdict at the close of all evidence, but the trial court allowed the case to go to the jury. N.T. 6/28/2016 at 6.

On June 28, 2016, the jury returned a verdict in favor of Appellant on the LIA claim[16] and awarded damages in the amount of $500,000.00.[17] Thereafter, on July 8, 2016, SEPTA filed Defendant's Motion for a New Trial (New Trial

---

it. If you have any notes, it would be good if you crossed them out just to make sure you don't consider them, but the case is still going to go on.

Obviously plaintiff's witnesses may very well be different, they may call different witnesses in a different order and we will all have to adjust to that, but that testimony must be disregarded.

N.T. 6/22/2016 (morning session) at 17-20.

[13] 45 U.S.C. §§ 51-60.

[14] 49 U.S.C. §§ 20701-20703.

[15] On June 24, 2016, after denying the compulsory non-suit motion regarding the FELA claim, the trial court held the motion under advisement as it related to the LIA claim. N.T. 6/24/2016 (Volume 5) at 30. On June 27, 2016, the trial court expressly denied SEPTA's motion as it pertained to Appellant's LIA claim. N.T. 6/27/2016 at 73.

[16] As Appellant correctly notes, the jury ruled against Appellant on his FELA claim in this matter. Appellant's Brief at 28 ("The jury, however, . . . found that [Appellant] *failed* to meet his burden in proving that SEPTA violated the FELA. In other words, the jury found SEPTA *not* negligent." (Emphasis in original)).

[17] The record does not indicate, and the parties do not allege, that SEPTA made an oral or written motion for judgment notwithstanding the verdict following the jury's verdict.

7

Motion), which Appellant answered on July 26, 2016. The trial court heard argument on the New Trial Motion on September 22, 2016, and granted the New Trial Motion on September 30, 2016,[18] awarding SEPTA a new trial. On October 5, 2016, Appellant timely appealed to this Court.

## II. Issues

Appellant raises the following claim for review:

> Whether the [t]rial [c]ourt erred when it granted the Appellee/Defendant SEPTA a new trial?

Appellant's Brief at 5.

## III. Discussion

Appellant argues 1) the trial court improperly struck the testimony of his expert, and 2) thereafter erred by granting SEPTA's post-trial New Trial Motion. *See* Appellant's Brief at 26-82. We disagree.

Initially, we note:

---

[18] The trial court's order granting the New Trial Motion reads as follows:

> **AND NOW**, this 30th day of September, 2016, upon consideration of the Defendant's Motion for a New Trial, and any responses thereto, and after oral argument was held on September 21, 2016, it is **ORDERED** and **DECREED** that the Defendant's Motion for a new trial is **GRANTED**. The court properly struck the testimony of plaintiff's only expert witness after hours of testimony because he had ignored significant railroad regulations and factual testimony concerning inspections which occurred. Although electrical principles are over 100 years in the making, plaintiff's expert created a new electric principle "Spillover Electricity" as his personal opinion without support. Therefore, in the interest of justice, a new trial is ordered.

Trial Court Order, September 30, 2016.

8

[t]he decision to order a new trial is one that lies within the discretion of the trial court. When determining whether the trial court abused its discretion, the appellate court must confine itself to the scope of review. Where, as here, the trial court has provided a specific reason for its ruling on a request for a new trial, and it is clear that the trial court based its decision on that reason, the appellate court must apply a narrow scope of review and may only reverse the decision of the trial court if it finds no basis on the record to support the reason of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with a trial court's authority to grant or deny a new trial.

Discretion is abused when a trial court's decision represents not merely an error of judgment but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Lahr v. City of York*, 972 A.2d 41, 52 (Pa. Cmwlth. 2009) (internal citations omitted).

The Supreme Court has set forth a two-pronged analysis for the appellate court's review of a new trial order. First, the appellate court must examine the decision of the trial court to see if it agrees that it made a mistake. Then, if it determines that a mistake was made during the trial, it must analyze whether the trial court abused its discretion in ruling on the motion for a new trial. Post-trial motions should be granted only where there is clear error of some kind, whereby someone has suffered prejudice by that error.

*Id.* at 47 (citing *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1123 (Pa. 2000)).

### A. FELA and LIA claims

Railroad employees may recover damages for injuries under the FELA upon proof that the railroad was negligent in providing a reasonably safe place to work. The FELA provides, in pertinent part:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. "Under the FELA, an employer has the duty to provide its employees with a reasonably safe work environment and safe work equipment." *Manson v. Southeastern Pennsylvania Transportation Authority*, 767 A.2d 1, 3 (Pa. Cmwlth. 2001) (internal citations and quotations omitted). "If an employee is injured because of an unsafe condition, the employer is liable if its negligence played any part, even the slightest, in producing the employee's injury." *Id.*

The LIA is a federal safety statute considered as an amendment to the FELA that permits a railroad to be held liable for failing to keep safe its locomotives, parts, and appurtenances,[19] and for failing to comply with FRA regulations. *McGinn v. Burlington Northern Railroad Company*, 102 F.3d 295, 298-99 (7th Cir. 1996).

The LIA provides in pertinent part:

---

[19] "Parts and appurtenances" means "whatever in fact is an integral part of a complete locomotive, and all parts or attachments definitely prescribed by lawful order of the Federal Railroad Administration." *Southern Railway Company v. Lunsford*, 297 U.S. 398 (1936).

10

A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.

The LIA does not create a right to sue or a cause of action per se, but instead establishes safety standards with which the failure to comply constitutes negligence under the FELA. *Urie v. Thompson,* 337 U.S. 163, 188–89 (1949). This means that a plaintiff "is required to *prove only the statutory violation* and thus is relieved of the burden of proving negligence." *Crane v. Cedar Rapids & Iowa City Railway Company*, 395 U.S. 164, 166 (1969) (emphasis added).

A violation of the LIA may be shown in one of two ways. The carrier may breach its duty to keep all parts and appurtenances in proper condition and safe to operate without unnecessary peril, or, alternatively, the carrier may breach a more specific duty by failing to comply with regulations issued by the []FRA[]. The LIA [is] to be liberally construed to afford protection to railroad employees and others by using safe equipment. The LIA imposes an absolute and continuing duty on a railroad carrier to provide safe equipment. Under the LIA, it is not necessary to prove that violations of safety statutes constitute negligence. Proof that an employer violated the

11

LIA is effective to show negligence as a matter of law. Strict liability under FELA results when a rail carrier violates one of the Safety Appliance Acts, which include the LIA. Thus, a railroad whose employees are injured as a result of the LIA will incur strict liability under FELA. . . . *In order to show a violation under the LIA, a plaintiff must show that the complained-of-condition created a safety hazard*.

*Harris v. BNSF Railway Company*, 393 S.W.3d 789, 794 (Tex. App. 2012) (internal citations and footnote omitted; emphasis added).

"[C]ommon-law duties and standards of care directed to the subject of locomotive equipment are pre-empted by the LIA." *Kurns v. Railroad Friction Products Corporation*, 565 U.S. 625, 637 (2012). LIA violations result in railroad liability independent of either employees' contributory negligence or care employed by railroads in inspecting their equipment. *Lilly v. Grand Trunk Western Railroad Company*, 317 U.S. 481 (1943). However, for liability under the LIA to attach, the plaintiff must still prove a causal relationship between a LIA violation and his alleged injury. *Crane*, 395 U.S. at 166; *Szerkeres v. CSX Transportation, Inc.*, 731 F.3d 592, 599 (6th Cir. 2013) ("A LIA violation constitutes negligence per se under [the] FELA only if Plaintiff can establish that the violation was a cause of the injury."); *Glow v. Union Pacific Railroad Company*, 652 F. Supp. 2d 1135, 1143 (E.D. Cal. 2009) ("In order to state a violation of the LIA, the plaintiff must show that the complained-of condition created a safety hazard. . . . It is not enough for plaintiff to show that the device or appurtenance did not work properly.").[20]

---

[20] We note that reported LIA and LIA-comparable cases all feature proof of specific LIA defects or failure to comply with regulations. *See, e.g., Minneapolis, St. Paul & St. Paul & Sault Ste. Marie Railway Company v. Goneau*, 269 U.S. 406 (1926) (non-compliant coupling arm); *Oglesby v. Southern Pacific Transportation Company*, 6 F.3d 603 (9th Cir. 1993) (seat not

12

## B. Striking the Expert Testimony

This Court must first examine whether the trial court erred by striking the testimony of Appellant's expert at trial. This determination was within the discretion of the trial court, and the judge did not abuse his discretion in striking the testimony.

The Pennsylvania Rules of Evidence provide the following regarding expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
> >
> > (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
> >
> > (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

> Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion. Testimony does not become scientific knowledge merely because it was proffered by a scientist. Likewise, expert testimony must be based on more than

---

compliant with LIA predecessor); *Harris v. BNSF Railway Company*, 393 S.W.3d 789, 794 (Tex. App. 2012) (non-compliant maintenance of digital electronic fuel gauge).

mere personal belief, and must be supported by reference to facts, testimony or empirical data.

*Snizavich v. Rohm & Haas Company*, 83 A.3d 191, 195 (Pa. Super. 2013) (internal citations and quotations omitted).[21] Where proposed expert testimony "scrupulously avoided the medical literature and was based entirely on subjective assessments of both cause and effect[,] . . . the evidence was too inherently unreliable to be presented to the jury." *Checchio v. Frankford Hospital - Torresdale Division*, 717 A.2d 1058, 1062 (Pa. Super. 1998).

The admissibility of an expert opinion is left to the sound discretion of the trial court. *Snizavich,* 83 A.3d at 194. As such, an appellate court will not reverse the trial court's decision absent an abuse of discretion. *Id.* An abuse of discretion may not be found where an appellate court might have reached a different conclusion than the trial court. *Id.* Rather, an abuse of discretion requires a result of manifest unreasonableness, partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous. *Id.*

The trial court's Pa. R.A.P. 1925(a) opinion summarized Appellant's expert's trial testimony as follows:

> [Appellant's] expert witness, George Widas, a professional engineer, had authored an expert report prior to trial which stated that [Appellant] may have received a surge of electricity into his body which traveled through his shoulder, into his arm and then down into the grounded grab iron as a result of what he termed "spillover electricity" created as a result of excessive arcing somewhere above the train car. In his report, Mr. Widas opined that SEPTA was negligent for failing to identify the problem of "spillover electricity" and to remedy the

---

[21] Although not binding, Superior Court decisions are persuasive authority in this Court. *Davis v. City of Philadelphia*, 702 A.2d 624, 626 (Pa. Cmwlth. 1997).

potential of serious harm to anyone holding onto the grab iron which, he opined, could have been done by wrapping the grab irons in insulating material. However, in Widas' testimony on direct examination, he did not posit the railroad's negligence for failure to wrap the grab irons in insulating material. However, he did attempt to find the railroad negligent for failure to ensure that the rubber baffles between the two cars of the train contained no gaps. Nothing about the rubber baffles was found in the report and the [c]ourt precluded this line of testimony.

During cross-examination, Mr. Widas admitted that the term "spillover electricity", which was the mechanism by which he opined that [Appellant] was exposed to electricity, electricity that went through the body of [Appellant] and then into the grab iron which was a grounded object, was a term of his own creation and that the term "spillover electricity" could not be located in any reference manual that he had ever consulted. He also admitted that he was unaware of even one other case in the history of electric railroads that someone claimed that they [sic] received a shock by merely standing in the rail car and holding onto a grounded metallic object.

Trial Court Pa. R.A.P. 1925(a) Opinion, dated January 17, 2017 (1925(a) Opinion), at 3.

Based on this testimony, the trial court granted SEPTA's motion to strike Appellant's expert's testimony, explaining that Widas' testimony was not sufficiently based on facts in evidence, failed to identify any specific failure on SEPTA's part, failed to discuss the appropriate regulations, and was based on a new term outside the scientific literature that Widas himself had created. Ultimately, the trial court explained it "made a mistake in permitting Mr. Widas['] testimony to be presented to the jury[.]" 1925(a) Opinion at 7. This determination was not manifestly unreasonable, did not misapply the law, and was not the result of

15

partiality, prejudice, bias, or ill will. Accordingly, the trial court acted within its discretion in striking Widas' testimony. *See Checchio*.

### *C. Grant of a New Trial*

Next, having determined the trial court did not err in striking Widas' testimony, we address the Supreme Court's mandated two-prong analysis for reviewing a grant of a new trial. This Court must now determine whether the trial court made a mistake during trial and whether the trial court abused its discretion in granting a new trial. *See Lahr*, 972 A.2d at 52 (citing *Harman*, 756 A.2d at 1123).

The grant of a new trial is within the discretion of the trial court. *Harman*, 756 A.2d at 1121. "[A]bsent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Id.* at 1122. "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Morrison v. Department of Public Welfare, Office of Mental Health (Woodville State Hospital)*, 646 A.2d 565, 571 (Pa. 1994). "In considering whether the record supports the trial court's decision, the appellate court is to defer to the judgment of the trial court, for the trial court is uniquely qualified to determine factual matters." *Id.* Further, a new trial will be warranted where a jury's verdict could have been based on improperly admitted evidence. *See Wilkes-Barre Iron and Wire Works, Inc. v. Pargas of Wilkes-Barre, Inc.*, 502 A.2d 210, 215 (Pa. Super. 2010).

The jury in this matter found against Appellant on the FELA claim and in favor of Appellant on the LIA claim. While we appreciate that, had the evidence supported a LIA violation, no further negligence evidence would have been required to find a violation under the FELA, we further recognize that, to show a LIA violation, Appellant must identify some specific complained-of condition or

16

aberration that created a safety hazard, and further must prove a causal relationship between the purported LIA violation and his alleged injury. *See Szerkeres*, *Glow, Harris.* Without Widas' testimony, no evidence of any LIA violation exists beyond Appellant's testimony that he received an electrical shock and the testimony of various SEPTA officials that no one should ever be shocked as Appellant claims.[22] Such evidence is insufficient to support a LIA claim.

The trial court's mistake was in assuming that the jury could and would disregard Widas' extensive testimony in its entirety. The trial judge stated that he was "confident that not only can [the jury] disregard it, but [the jury] will disregard it." N.T. 6/22/2016 (morning session) at 19. However, given the nature of the claims, Widas' testimony, the dearth of other evidence of defect and/or negligence, and the jury's verdict in this matter, it would be reasonable to conclude that the jury considered the stricken Widas testimony in reaching its verdict, despite the trial court's cautionary instruction, and that SEPTA suffered prejudice as a result. Consequently, the trial court's grant of a new trial was not manifestly unreasonable, nor did it misapply the law or result from partiality, prejudice, bias, or ill will.

Based on the above, we conclude the trial court acted within its discretion in granting a new trial. *See Wilkes-Barre*. Accordingly, we affirm.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[22] We note that none of the testifying SEPTA officials had ever encountered or heard of anyone being shocked in the manner complained of by Appellant.

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steven Ashby,                :
         Appellant        :
                    :
        v.                :
                    :
Southeastern Pennsylvania   :    No. 1703 C.D. 2016
Transportation Authority     :

# O R D E R

AND NOW, this 5th day of April, 2018, the order of the Philadelphia County Court of Common Pleas dated September 30, 2016 is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge